**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

IFS NORTH AMERICA, INC., a foreign corporation and IFS CANADA, INC., a foreign corporation,

Plaintiffs,

v.

BETHANY POLLOCK, an individual,

Defendant.

Case No.________________

**VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF & DAMAGES**

IFS North America Inc. and IFS Canada, Inc. ("IFS"), through its undersigned attorneys, files this Verified Complaint for Injunction and Damages against Defendant, BETHANY POLLOCK ("Pollock" or "Defendant"), and states as follows:

**INTRODUCTION**

1. This case arises from Defendant Bethany Pollock's decision to leave IFS North America, Inc., and IFS Canada, Inc., d/b/a Copperleaf (successor in interest to Copperleaf Technologies, Inc.) and – in total breach of her contractual obligations to her employer – join one of its direct competitors, and undertake the very type of competitive work that she expressly agreed not to perform for six months after her departure.

2. Pollock was not a peripheral employee. As a Senior Client Success Manager, she served as a principal interface with Copperleaf's utility and infrastructure customers and was immersed in the confidential and trade secret protected methods Copperleaf uses to implement its products, manage and retain customers, address customer problems, develop accounts, and compete in the highly specialized Asset Investment Planning ("AIP") market. She also had access to confidential customer intelligence

including customer vulnerability analysis, pricing information, competitive analyses, strategic plans, and other proprietary information developed by Copperleaf over years of investment.

3. In exchange for that access and employment, Pollock signed an Employment Agreement requiring her to protect Copperleaf's confidential information and, for six months after her employment ended, refrain from working for a business that directly competes with Copperleaf in the same geographic area – within the Americas. Pollock further agreed not to solicit customers, suppliers, or employees with whom she worked or engage in conduct likely to impair Copperleaf's business relationships.

4. In utter disregard for her contractual obligations, Pollock nevertheless accepted employment with Engineered Intelligence, Inc. ("EI"), a direct competitor that markets competing AIP solutions to many of the same utility and infrastructure customers served by Copperleaf. Her new position substantially overlaps with her former responsibilities at Copperleaf. Indeed, Pollock publicly announced that she had joined EI and was "working to build a new CSM function" there.

5. Pollock did not join EI in isolation. EI has recruited numerous former Copperleaf executives and employees into senior positions. Most notably, EI's Board of Directors now includes Phil Jones, Copperleaf's former Managing Director for the Americas—the same executive who personally executed Pollock's July 2024 Employment Agreement on Copperleaf's behalf. Thus, at least one senior EI insider had actual knowledge of Pollock's restrictive covenant before EI employed her in a directly competitive role.

6. These circumstances present precisely the competitive risk Pollock's six-month covenant was designed to prevent. Copperleaf spent years developing its customer-success methodologies, implementation practices, customer intelligence, business strategies, and confidential know-how. Pollock learned those systems from inside Copperleaf and has now publicly announced that

she is helping a direct competitor build a competing customer-success function while her six-month restriction remains in effect.

7. IFS does not seek to prevent Pollock from working indefinitely or from using her general skills and experience. It seeks enforcement of the limited six-month restriction she agreed to, protection against the use or disclosure of its confidential information and trade secrets, and preservation of the customer relationships and goodwill the Agreement was intended to protect.

8. IFS therefore brings this action for breach of contract and actual and threatened misappropriation of trade secrets under Florida and federal law, and seeks preliminary and permanent injunctive relief, damages, and other relief available under applicable law.

**THE PARTIES AND RELATED ENTITIES**

9. IFS North America, Inc. is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Itasca, Illinois.

10. Copperleaf Technologies (USA) Inc. is Pollock's former employer and the original party in interest to her Employment Agreements. Copperleaf was subsequently acquired by IFS Canada, Inc.

11. Defendant Bethany Pollock ("Pollock") is a natural person residing in Clermont, Lake County, Florida and is a citizen of the State of Florida.

12. Engineered Intelligence, Inc. ("EI") is a corporation organized and existing under the laws of Canada with its principal place of business in Calgary, Alberta, Canada.

**JURISDICTION AND VENUE**

13. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331, because IFS asserts claims arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

14. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)

because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States and citizens or subjects of foreign states.

15. IFS is a citizen of Wisconsin and Illinois for purposes of 28 U.S.C. § 1332.

16. Defendant Bethany Pollock is a citizen of Florida.

17. The amount in controversy exceeds $75,000, because IFS seek injunctive relief enforcing restrictive covenants, protecting confidential information and trade secrets, preserving valuable customer relationships and goodwill, and recovering damages caused by Defendant's conduct.

18. This Court has supplemental jurisdiction over IFS's related state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as IFS's federal claims.

19. Venue is proper in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1391, because Defendant Pollock resides in this District, a substantial portion of the events giving rise to IFS's claims occurred in this District, and Defendant's conduct caused injury within this District.

20. Venue is also proper because Pollock expressly agreed in her Employment Agreement that disputes arising from her employment and the Agreement would be governed by Florida law and litigated exclusively in Florida state or federal courts.

## FACTUAL BACKGROUND

### A. Defendant's Employment Agreement & Continuing Obligations

21. On July 22, 2024, in connection with her hiring, Defendant Pollock entered into an Employment Agreement with Copperleaf Technologies (USA) Inc. governing, among other things, confidentiality obligations, restrictive covenants, ownership of confidential information, return of company property, and post-employment obligations. (Exhibit 1.)

22. Specifically, the Agreement includes the following provision as to Confidential

Information:

a) You agree that, as a consequence of your employment with the Company and for the more effective performance of your duties, you will be provided with access to confidential and proprietary information and knowledge relating to the business of the Company and Parent Company (collectively, the "Companies") including, but not limited to, computer hardware, computer software (in object code and source code form), script, programming code, data, information, engineering designs, communications technology and protocols, product specifications and design, pricing and cost data, business strategies, customer requirements, unpublished corporate financial information, trade secrets, know-how, methodologies and processes relating to the Companies' products and services as well as third party information which the company has a duty to keep confidential (**"Confidential Information"**).

b) You agree that you will not, either during your employment with the Company or after the termination of your employment with the Company, except in the proper course of your duties pursuant to such employment, use or disclose to any person, firm, corporation or other entity any Confidential Information which may have come to your knowledge, and after the termination of your employment, for any reason whatsoever, you will not at any time or for any purpose use any Confidential Information which you may have acquired during the course of your employment by the Company. You shall not transfer any Confidential Information to a personal computer or other personal electronic devices at any time before or after your employment with the Company. You further understand that nothing in this Agreement prohibits you from reporting to any governmental authority information concerning possible violations of law or regulation and that you may disclose Confidential Information to a government official or to an attorney and use it in certain court proceedings without fear of prosecution or liability, provided you file any document containing Confidential Information under seal and do not disclose the Confidential Information, except pursuant to court order. Under U.S. Defend Trade Secrets Act of 2016, you understand you will not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made in confidence to government officials, either directly or indirectly, or to an attorney, in each case solely for the purpose of reporting or investigating a suspected violation of law, or in a complaint or other document filed in a lawsuit or other proceeding, provided such filing is made under seal. You understand that in the event it is determined that the disclosure of the Companies' trade secrets was not done in good faith pursuant to the above, you will be subject to substantial damages, including punitive damages and attorney's fees. If you have any questions as to what comprises such confidential or proprietary information or trade secrets, or to whom if anyone it may be disclosed, you will consult your manager.

23. Additionally, the Agreement contains a promise by Pollock she will not unfairly compete with IFS following the end of her employment by accepting competitive employment in the same geographic area within 6 months of her employment ending. This provision is as follows:

> 13. **Non-Competition:** You understand and agree that during employment and upon termination of your employment by the Company for any reason whatsoever, the Company shall be entitled to reasonable protection against your unfair use of the Confidential Information, and against unfair competition by you utilizing any such information. Without limiting the generality of the foregoing, you agree that upon the termination of your employment with the Company, for any reason whatsoever, you will not, for a period of six (6) months, commencing on the date of the termination of your employment with the Company, directly or indirectly, as a shareholder, employer, employee, partner, proprietor, director, officer, principal, agent, advisor or through the medium of any firm, corporation or other entity or in any other capacity whatsoever:
>
> (a) carry on or be engaged in, any business which directly competes with the Company, within Territory;
>
> (b) solicit or attempt to solicit any customer, supplier or employee of the Company that you engaged, contacted or worked with; or
>
> (c) do any act the probable result of which would cause the relations between the Company and its customers, suppliers, employees or others, or any one of them to be impaired;
>
> provided however, that the foregoing provisions of this paragraph shall not in any way restrict your right to accept employment, or to engage in any business which does not compete with the Company.
>
> For the purposes of this paragraph, "Territory" shall be defined as North, Central and South America "Americas".

24. Additionally, Pollock expressly acknowledged in the Employment Agreement that the restrictive covenants contained in the Agreement were reasonable and necessary to protect IFS's legitimate business interests.

25. Pollock further acknowledged and agreed that any breach or threatened breach of the Agreement would cause IFS irreparable harm for which monetary damages would be an inadequate remedy.

26. Accordingly, Pollock agreed that IFS would be entitled to immediate injunctive relief, in addition to all other remedies available at law or in equity, to prevent any actual or threatened breach of the Employment Agreement.

27. Following IFS's acquisition of Copperleaf on August 29, 2024, Copperleaf was acquired by IFS Canada, Inc., with IFS Canada, Inc. as the sole surviving entity. As the surviving entity,

IFS Canada succeeded to the rights and interests of Copperleaf Technologies (USA) Inc., including its rights under Pollock's Employment Agreement. (Exhibit 2.)

28. The Employment Agreement constitutes a valid, binding, and enforceable contract supported by adequate consideration, including Pollock's employment, compensation, access to confidential information, and access to IFS's customers, goodwill, business relationships, and proprietary business methods.

**B. IFS Competes in a Specialized, Relationship-Driven Market**

29. As noted above, IFS is a leading provider of AI-powered asset investment planning and asset lifecycle management software that helps utilities and other asset-intensive organizations optimize capital spending, manage risk, and make data-driven investment decisions across critical infrastructure assets.

30. IFS's Asset Investment Planning business operates in a highly specialized and competitive marketplace serving utilities, infrastructure operators, and other asset-intensive organizations. IFS's success depends in significant part on its confidential information, proprietary methodologies, customer relationships, implementation strategies, business plans, pricing information, and customer-success processes.

31. Before and during Pollock's employment, IFS has expended substantial resources developing and protecting those assets and derives significant competitive value from maintaining their secrecy. IFS treats such information as confidential, and limits access to employees whose responsibilities require it.

**C. During her Employment, Defendant Possessed Access to IFS's Most Sensitive Customer Intelligence**

32. During her employment, Pollock occupied a position of trust and confidence and was entrusted with some of IFS's most sensitive and competitively valuable information.

33. Pollock was not a rank-and-file employee with limited exposure to IFS's operations. Rather, her role as Senior Client Success Manager required her to serve as a principal interface between IFS and its utility and infrastructure customers, maintain and expand customer relationships, support implementation and adoption of IFS's software solutions, address customer concerns and strategic objectives, and support customer-retention and business-growth initiatives. Through those responsibilities, Pollock developed extensive knowledge concerning how IFS acquires, services, retains, and expands relationships with its customers.

34. Through her responsibilities, Pollock obtained detailed knowledge regarding IFS's customer-success methodologies, customer-engagement strategies, implementation practices, escalation procedures, customer-retention initiatives, renewal strategies, performance metrics, organizational frameworks, and strategic approaches to managing customer relationships. This knowledge was developed by IFS over many years through substantial investment of resources and is not publicly available.

35. Pollock also had access to highly sensitive customer-specific information, including customer requirements, customer preferences, operational challenges, strategic priorities, implementation histories, product utilization information, account-development plans, renewal opportunities, and information concerning IFS's relationships with existing and prospective customers. In IFS's highly specialized market, such information provides substantial competitive value because it allows a competitor to better understand customer needs, customer decision-making processes, and opportunities for business development.

36. In addition, Pollock had access to IFS's confidential pricing information, strategic business plans, competitive analyses, implementation methodologies, product-development information, business processes, and proprietary know-how concerning IFS's Asset Investment

Planning business. Such information derives independent economic value from not being generally known to competitors and provides IFS with significant competitive advantages in the marketplace.

37. In fact, Defendant's position gave her access not merely to customer names and contact information, but to IFS's centralized intelligence concerning the status, vulnerabilities, health, risks, and commercial opportunities associated with its customer relationships.

38. Among other things, Defendant was responsible for managing a confidential internal dashboard that consolidated critical information concerning IFS's customers and accounts. The dashboard provided, in a single location, information concerning the status of customer relationships, issues or concerns affecting particular accounts, upcoming renewal dates, and information relevant to retaining and expanding existing business and pursuing additional opportunities.

39. The dashboard effectively provided an internal roadmap of IFS's customer relationships. It identified not simply who IFS's customers were, but what was happening inside those relationships: which accounts presented problems or risks, when contractual or renewal decisions were approaching, and where opportunities existed to preserve, expand, or develop business.

40. That information would provide substantial competitive value for a company competing with IFS for the same customers. A competitor armed with such information could identify vulnerable customer relationships, anticipate renewal opportunities, tailor its approach to known customer concerns and priorities, and focus its business-development efforts where they were most likely to succeed.

41. The information reflected in the dashboard was compiled through IFS's ongoing customer relationships and the efforts of its employees and was not publicly available. IFS treated the information as confidential and restricted access to employees whose responsibilities required it, including Pollock.

42. IFS took substantial measures to protect the confidentiality of this information. Access

was restricted to employees whose responsibilities required such access, including Pollock. IFS further required employees to execute confidentiality agreements and imposed contractual restrictions governing the use, disclosure, and protection of Confidential Information.

43. The utility and infrastructure planning market in which IFS operates is highly specialized and relationship-driven. Success in that market depends heavily upon a company's understanding of customer needs, implementation requirements, operational priorities, investment-planning objectives, and long-term strategic initiatives. Consequently, the customer-success methodologies, customer intelligence, implementation strategies, and relationship-management practices to which Pollock was exposed constitute some of IFS's most valuable confidential assets.

44. Through her role, Pollock learned not merely who IFS's customers were, but how IFS successfully acquires, services, retains, and expands those customer relationships. She learned what IFS believed worked, what did not work, how IFS differentiated itself from competitors, how IFS responded to customer concerns, how IFS measured customer success, and how IFS sought to maximize long-term customer retention and growth. The confidential methodologies, organizational frameworks, customer-success strategies, customer intelligence, and strategic know-how to which Pollock was exposed are directly relevant to the responsibilities she now publicly represents she is performing for a direct competitor.

**D. Defendant Joins a Direct Competitor to Build a Competing Customer-Success Function**

45. Prior to her separation from employment with IFS, Pollock accepted employment with Engineered Intelligence, Inc. ("EI"), a company operating in the same highly specialized Asset Investment Planning ("AIP") marketplace. Unlike a former employee moving to a company operating in a distinct industry or serving a different customer base, Pollock joined an organization that markets and sells products and services directed at the same utility and infrastructure customers that comprise

IFS's core market.

46. EI markets its ENGIN™ platform as a solution for investment scenario planning, lifecycle investment planning, asset investment planning, and risk management for utility and infrastructure organizations. Those offerings directly overlap with the functions performed by IFS's AIP platform and address many of the same business needs and customer challenges. IFS and EI compete for many of the same customers, prospective customers, industry relationships, and business opportunities.

47. The competitive overlap between IFS and EI is substantial and direct. The market in which IFS operates is not a generic software market. Rather, it is a highly specialized industry in which customer-specific knowledge, implementation experience, strategic planning methodologies, and long-term customer relationships provide significant competitive advantages. Information concerning how IFS acquires, supports, retains, and expands customer relationships is particularly valuable because purchasing decisions often involve lengthy sales cycles, extensive implementation efforts, and long-term strategic planning by customers.

48. Pollock accepted a role at EI that substantially overlaps with the responsibilities she performed for IFS. The position places her in a role involving customer-success operations, customer engagement, customer-retention initiatives, strategic planning, and the development of processes supporting customer relationships in the same market in which she previously worked for IFS.

49. IFS's concerns only intensified when Pollock publicly announced on a LinkedIn post that she was excited to be "working to build a new CSM function" for EI. Pollock did not simply announce that she had accepted employment with a competitor. Rather, she publicly represented that she was helping to create and build a customer-success management function for a direct competitor operating in the same market served by IFS.

50. That statement was particularly troubling because IFS spent years developing and refining its customer-success organization, customer-engagement methodologies, implementation practices, retention strategies, escalation protocols, and customer-management frameworks. Pollock spent her employment immersed in those systems, processes, and methodologies. Her public admission that she was helping a direct competitor "build a new CSM function" created an immediate and reasonable concern that she intended to rely upon or utilize knowledge, frameworks, methodologies, processes, and know-how acquired during her employment with IFS.

**E. EI's Senior Leadership Includes Former Copperleaf Executives With Personal Knowledge of Defendant's Obligations**

51. IFS's concerns were heightened further by publicly available information indicating that numerous former Copperleaf employees and executives have migrated to EI in recent years. Publicly available information identifies Carmen Eskensen, Account Executive, formerly a Solutions Consultant at Copperleaf; Matt Beckman, Head of Growth, formerly Copperleaf's Regional Director of Sales; Damien Quentin, Head of Strategy, formerly Director of Product Marketing at Copperleaf; Stefan Sadnicki, Sales Director of Europe, formerly Copperleaf's Senior Vice President Europe and a member of its Senior Leadership Team; Phil Jones, Board Member, formerly Copperleaf's Managing Director for the Americas and a member of its Senior Leadership Team; and Sandra MacKay, Head of Legal, formerly Copperleaf's Global Vice President of Corporate and Legal and a member of its Senior Leadership Team.

52. These individuals previously occupied positions providing access to IFS's strategic business plans, customer relationships, pricing information, competitive analyses, implementation methodologies, market-development plans, and other highly sensitive confidential information. Upon information and belief, the concentration of former Copperleaf personnel at EI materially increases the risk that IFS's confidential information and trade secrets will be disclosed, shared, utilized, or exploited

for EI's competitive benefit.

53. Of particular significance, Phil Jones personally executed Pollock's July 2024 Offer Letter and Employment Agreement on behalf of Copperleaf. Jones thus possessed direct knowledge of the restrictive covenant obligations governing Pollock's employment. Publicly available information reflects that Jones now serves as a member of EI's Board of Directors. Upon information and belief, these circumstances demonstrate that individuals associated with EI knew or should have known of Pollock's ongoing contractual obligations when she accepted employment with EI.

54. Of further significance, Sandra MacKay, now publicly identified as EI's Head of Legal, formerly served as Copperleaf's Global Vice President of Corporate and Legal and was a member of Copperleaf's Senior Leadership Team. In that role, MacKay drafted Pollock's Employment Agreement on behalf of Copperleaf and therefore possessed direct knowledge of the restrictive covenant obligations governing Pollock's employment. Upon information and belief, MacKay's role as the drafter of the Agreement, together with her current senior legal position at EI, further demonstrates that individuals associated with EI knew or should have known of Pollock's ongoing contractual obligations when she accepted employment with EI.

55. IFS is further aware of publicly available information indicating that EI has actively positioned itself against IFS in the marketplace. According to publicly available information reviewed by IFS, EI has promoted competing AIP offerings, publicly compared its products and methodologies to those offered by Copperleaf, and allegedly displayed images depicting Copperleaf software functionality in marketing content. While IFS continues to investigate those matters, such conduct further underscores the direct competitive relationship between IFS and EI and heightens IFS's concern regarding the treatment of its confidential information and trade secrets.

**F. Defendant Continues Her Competitive Employment After Notice of Her Obligations**

56. On July 6, 2026, IFS, through counsel, transmitted a detailed cease-and-desist letter to Pollock reminding her of her continuing obligations under the Employment Agreement. IFS advised Pollock that EI was considered a competitor of IFS, that her role appeared to overlap substantially with her former role, that she had a high likelihood of calling upon overlapping customers, and that her public statements regarding the creation of a new customer-success function raised serious concerns regarding the use and disclosure of IFS's Confidential Information and trade secrets. (Exhibit 3.)

57. IFS demanded information concerning Pollock's position at EI, the nature of her duties and responsibilities, any Copperleaf information utilized in connection with the development of EI's customer-success function, the safeguards implemented to prevent the use or disclosure of IFS's Confidential Information, and confirmation that she intended to comply with her contractual obligations. IFS further demanded preservation of all evidence relating to her employment with IFS, her employment with EI, and the issues identified in the cease-and-desist letter.

58. Pollock provided a copy of the Client Success Manager job posting from EI which confirms that she is working in a directly competing role with substantially equivalent job duties. (Exhibit 4.)

59. Pollock refused to acknowledge her obligations under the Agreement to refrain from unfair competition during the six-month period after her employment ends.

60. Based upon Pollock's extensive access to IFS's Confidential Information, her acceptance of employment with a direct competitor in the same specialized market, her public representation that she is helping build a competing customer-success function, the substantial overlap between her former and current responsibilities, and the absence of adequate assurances that IFS's Confidential Information has not been and will not be used, IFS has a strong and reasonable basis to

believe that Pollock has breached, is breaching, and threatens to continue breaching her contractual and statutory obligations.

61. Pollock's new responsibilities also create a substantial and imminent risk that she will necessarily draw upon IFS's confidential customer intelligence and trade secrets in performing her work for EI. Pollock was deeply familiar with IFS's nonpublic customer-status information, renewal timing, account risks and opportunities, customer-success methodologies and strategic approaches to retaining and expanding customer relationships. She has now undertaken building a competing customer-success function for a direct competitor, serving the same specialized market. The substantial overlap between the confidential information Pollock possesses and the work she has undertaken for EI creates – at a minimum – a concrete threat of use or even inevitable disclosure of IFS's trade secrets in the performance of her new responsibilities.

62. Unless restrained by this Court, Pollock's conduct will continue to cause immediate and irreparable harm to IFS's confidential information, trade secrets, customer relationships, goodwill, competitive position, and business opportunities. Such injuries are not readily measurable, are difficult to quantify, and cannot be adequately remedied through monetary damages alone.

**COUNT I**
**BREACH OF CONTRACT**
**(DAMAGES)**

63. IFS repeats and realleges all paragraphs of this Complaint.

64. Defendant Pollock entered into a valid and enforceable Employment Agreement dated July 22, 2024, with Copperleaf Technologies (USA) Inc.

65. Through acquisition and corporate succession, IFS succeeded to and acquired all rights under the Employment Agreement, including the right to enforce the restrictive covenants, confidentiality provisions, and all remedies set forth therein.

66. IFS fully performed all obligations required under the Employment Agreement.

67. The Employment Agreement prohibits Pollock from using or disclosing IFS's Confidential Information during or after her employment and expressly provides that those confidentiality obligations survive termination.

68. The Employment Agreement further prohibits Pollock, for a period of six months following termination of employment, from directly or indirectly engaging in a business that competes with IFS within the defined Territory, soliciting customers, suppliers, or employees with whom she worked, and engaging in conduct likely to impair IFS's business relationships.

69. Pollock accepted employment with Engineered Intelligence, a business operating in the same Asset Investment Planning market as IFS and competing for the same utility and infrastructure customers.

70. Pollock accepted employment with EI during the contractual restricted period.

71. Upon information and belief, Pollock's current position substantially overlaps with the position she held with IFS.

72. Pollock publicly represented that she was helping to "build a new CSM function" for EI.

73. Pollock's conduct breaches, or threatens to breach, the non-competition, confidentiality, non-solicitation, and non-interference provisions of the Employment Agreement.

74. As a direct and proximate result of Pollock's breaches, IFS has suffered and continues to suffer damages, including loss of goodwill, loss of competitive advantage, injury to customer relationships, and injury to confidential and proprietary business interests.

75. Pursuant to Section 15 of the Employment Agreement, IFS is entitled to immediate injunctive relief.

76. Because Pollock has continued violating the Agreement while enjoying the benefits of competing employment, equity requires tolling and extension of the six-month restrictive period for a duration equal to the period of noncompliance.

NOW, IFS requests entry of judgment against Pollock and an award of damages, preliminary and permanent injunctive relief, equitable tolling and extension of the restrictive period, attorneys' fees where authorized, costs, and all other appropriate relief.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS/ VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT (Florida Statutes Section 688.001 *et. seq.*)**

77. IFS repeats and realleges all paragraphs of this Complaint.

78. This is an action pursuant to the Florida Uniform Trade Secrets Act, Chapter 688 of the Florida Statutes, for temporary and injunctive relief and damages upon Defendant's misappropriation of IFS's trade secrets.

79. IFS's confidential information and trade secrets constitute trade secrets within the meaning of FUTSA.

80. Pollock acquired those trade secrets through a confidential relationship with IFS.

81. Pollock has misappropriated, threatens to misappropriate, or inevitably will misappropriate IFS's trade secrets.

82. Pollock's actions have caused and continue to cause injury to IFS.

83. IFS lacks an adequate remedy at law.

NOW, IFS demands an entry of a temporary injunction, thereafter to be made permanent, in accordance with Florida Statutes § 688.003, enjoining Defendant from any misappropriation or further misappropriation of IFS's trade secrets and all other documents, data, and information derived from IFS's trade secrets; requiring Defendant to return all of IFS's trade secrets and all

other documents, data, and information derived from IFS's trade secrets; awarding IFS exemplary damages in accordance with Florida Statutes § 688.004; awarding IFS attorney's fees pursuant to § 688.005; awarding IFS court costs; and ordering such other further relief as the Court deems just and proper.

**COUNT III**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(18 U.S.C. § 1836)**

84. IFS repeats and realleges all paragraphs of this Complaint.

85. IFS owns valuable trade secrets as defined by 18 U.S.C. § 1839.

86. Those trade secrets include, among other things: customer-success methodologies; customer-engagement processes; implementation strategies; customer requirements and preferences; customer-retention practices; pricing and cost information; strategic planning information; competitive analyses; proprietary business processes; product and service methodologies; and other confidential business information.

87. The trade secrets derive independent economic value from not being generally known to or readily ascertainable by IFS's competitors.

88. IFS took reasonable measures to maintain the secrecy of its trade secrets, including confidentiality agreements, access limitations, return-of-property requirements, and contractual restrictions on use and disclosure.

89. Pollock acquired knowledge of IFS's trade secrets during her employment.

90. Upon information and belief, Pollock has used, disclosed, or threatens to use or disclose IFS's trade secrets in connection with her employment by EI, including in developing or performing the customer-success functions she publicly announced she was hired to build.

91. Pollock's public statement that she is helping build a new customer-success management function for a direct competitor creates a substantial threat that IFS's trade secrets will be used to develop, improve, or operate competing functions and services.

92. Pollock's conduct constitutes actual and/or threatened misappropriation of IFS's trade secrets in violation of the DTSA.

93. IFS has suffered and will continue to suffer irreparable injury absent injunctive relief.

NOW, IFS requests entry of judgment against Pollock, preliminary and permanent injunctive relief, actual damages, exemplary damages pursuant to 18 U.S.C. § 1836(b)(3), attorneys' fees, costs, and all other relief authorized by law.

**JURY TRIAL DEMAND**

IFS demands a jury trial on all issues.

Respectfully submitted,

By: */s/ Kelly E. Eisenlohr-Moul*
Counsel for Plaintiffs IFS North America, Inc. and IFS Canada, Inc., d/b/a Copperleaf

Kelly E. Eisenlohr-Moul, Esq.
Nancy Johnson, Esq.
**JACKSON LEWIS P.C.**
390 N. Orange Ave.; Ste. 1285
Telephone: (407)246-8440
Facsimile: (407)246-8441
Kelly.Eisenlohr-Moul@jacksonlewis.com
Nancy.Johnson@jacksonlewis.com

**VERIFICATION**

I, Palmina Cuddihey, Director, Human Resources, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am authorized to make this verification on behalf of IFS North America, Inc. and IFS Canada, Inc., d/b/a Copperleaf, that I have read the Verified Complaint for Emergency Injunctive Relief & Damages, and that the factual statements it contains are true and correct to the best of my knowledge, information, and belief.

Palmina Cuddihey
Director, Human Resources, IFS Canada, Inc. d/b/a Copperleaf

# Pollock_Copperleaf - Verified Complaint (FINAL - 8.24.26)

Final Audit Report 2026-08-24

| | |
|---|---|
| Created: | 2026-08-24 |
| By: | Bonnie Reich (Bonnie.Reich@jacksonlewis.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAHVxdb4b18bOIMnV0TkjfrPH7QLpgtLYI |

## "Pollock_Copperleaf - Verified Complaint (FINAL - 8.24.26)" History

- Document created by Bonnie Reich (Bonnie.Reich@jacksonlewis.com)
  2026-08-24 - 1:42:45 PM GMT

- Document emailed to palmina.cuddihey@ifs.com for signature
  2026-08-24 - 1:44:01 PM GMT

- Email viewed by palmina.cuddihey@ifs.com
  2026-08-24 - 1:51:10 PM GMT

- Signer palmina.cuddihey@ifs.com entered name at signing as Palmina Cuddihey
  2026-08-24 - 1:52:04 PM GMT

- Document e-signed by Palmina Cuddihey (palmina.cuddihey@ifs.com)
  Signature Date: 2026-08-24 - 1:52:06 PM GMT - Time Source: server - Signature Appearance Selected: IMAGE

- Agreement completed.
  2026-08-24 - 1:52:06 PM GMT